1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KATHLEEN SOGA,                          No.  2:14-cv-01084-KJM-KJN

12                  Plaintiff,

13       v.                                  ORDER

14   ROLF KLEINHANS and COUNTY OF
     NEVADA,
15
                     Defendants.
16

17

18              After five years of working in the Nevada County Sheriff's Department, Kathleen

19   Soga resigned, attributing her resignation to the harassment of her former supervisor, Rolf

20   Kleinhans, the Chief Fiscal and Administrative Officer for the Department.  Shortly after her

21   resignation, Ms. Soga filed this action against Mr. Kleinhans, as well as the County of Nevada,

22   alleging sexual harassment, constructive discharge, and retaliation.  After the close of discovery,

23   the County and Mr. Kleinhans moved for summary judgment on all Ms. Soga's claims.  Mot.,

24   ECF No. 17.  Ms. Soga opposed the motion, Opp'n, ECF No. 25, and defendants replied, Reply,

25   ECF No. 28.

26   /////

27   /////

28   /////

                                             1

At hearing on the motion, Kerry Schaffer appeared for plaintiff and Carl Fessenden and Ariana Van Alstine appeared for defendants.  ECF No. 29.  For reasons explained below, defendants' motion is GRANTED IN PART and DENIED IN PART.[1]

I.      PROCEDURAL HISTORY AND CLAIMS

As discussed in more detail below, Ms. Soga's suit tracks an internal harassment and hostile work environment complaint submitted to the County's Human Resources (HR) division on April 16, 2013.   Defs.' Ex. L, Soga's Formal Discrimination Harassment Complaint (HR Compl.), ECF No. 17-5.  After submitting the HR complaint and before filing suit, Ms. Soga filed an administrative complaint with the California Department of Fair Employment and Housing (DFEH) on September 5, 2013, alleging sexual harassment, discrimination, retaliation, and constructive discharge.  Defs.' Ex. M, ECF No. 17-5.  Ms. Soga then filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC) on November 19, 2013, alleging sexual harassment and retaliation.  Defs.' Ex. N, ECF No. 17-5.  Ms. Soga received immediate right-to-sue notifications from both agencies.  Defs.' Ex. M; Defs.' Ex. N.  Ms. Soga then commenced this action on May 1, 2014, asserting the following claims: (1) hostile environment due to sexual harassment in violation of Title VII and FEHA; (2) retaliation in violation of Title VII and FEHA; and (3) retaliation in violation of California Labor Code section 1102.5.  *See generally* Compl., ECF No. 1.

Ms. Soga did not present her Labor Code retaliation claim in the form of a California Government Tort Claim before filing suit against the County or Mr. Kleinhans. Undisputed Material Fact (UMF) No. 46.

/////

/////

_____

[1] In Ms. Soga's opposition, she noted defendants did not meet and confer prior to filing the motion, thereby violating the court's standing order.  Opp'n at 12.  In defendants' reply, they argue Ms. Soga filed an untimely opposition, and therefore the motion for summary judgment should be granted as unopposed.  Reply. at 2.  Given the parties' equivalent transgressions, the court does not impose sanctions, but the parties are cautioned they cannot assume the court will respond with such magnanimity in the future.

1    II.      UNDISPUTED MATERIAL FACTS[2]

2           The following facts are undisputed unless otherwise stated.  Where a genuine

3    dispute exists, the court draws reasonable inferences in favor of Ms. Soga.  *Tolan v. Cotton*,

4    ___U.S.___, 134 S. Ct. 1861, 1868 (2014).

5           A.      Ms. Soga's History with County Sheriff's Department

6           Ms. Soga started with the County Sheriff's Department in April 2008 as a

7    dispatcher trainee, and then became a legal office assistant (LOA) in Nevada City under the

8    supervision of Public Administrator Robert Wood.  Mot. at 7; ECF No. 37-7 at 26.  Under Mr.

9    Wood's supervision, Ms. Soga assisted in the public administration of decedents' estates.  Pl.'s

10   Undisputed Material Facts (PUMF) No. 2, ECF No. 28-3.  Mr. Wood retired in May 2011, and

11   Ms. Soga then started work under the supervision of Mr. Kleinhans, the new Public Administrator

12   and Chief Financial Officer (CFO) for the Sheriff's Department.  PUMF Nos. 2, 9.

13          B.      Interactions with Mr. Kleinhans

14          While working on an estate matter together in June 2011, Ms. Soga and

15   Mr. Kleinhans encountered a beehive on the estate property.  UMF No. 28, ECF No. 28-1.

16   Mr. Kleinhans suggested his friend had experience with bees and could remove the beehive.  *Id.*

17   Ms. Soga responded, "You can't hire your friends . . . you need to be careful with that."  *Id.*

18   Additionally, Ms. Soga told him she had already called another company for a referral.  Soga

19   Dep. 46:10–12.

20          The relationship between Ms. Soga and Mr. Kleinhans turned sour shortly after

21   this incident.  Soga Dep. 40:9–17.  For example, when working on another estate to collect

22   donations with representatives for Habitat for Humanity, Ms. Soga asked Mr. Kleinhans for

23   guidance, but he declined to help.  HR Compl. at 77.[3]  Mr. Kleinhans eventually came to the

24

25          [2] Ms. Soga requests the court take judicial notice of a description of the California
26   Government Claims Program.  ECF No. 21.  Because this fact is not relevant to resolution of this
     motion, Ms. Soga's request is denied.

27          [3] Ms. Soga relies on facts alleged in her HR Complaint.  ECF No. 24.  Defendants do not
28   object to her reliance, and in fact rely on the HR Complaint as well.  *Id.*  For purposes of this

                                            3

1   estate, however, and heard Ms. Soga had discovered a water leak on the property.  *Id.*

2   Mr. Kleinhans suggested Ms. Soga call one of his friends to do the plumbing work, and Ms. Soga

3   again said he could not hire his friends.  *Id.*  The conversation quickly turned into an argument,

4   and in Ms. Soga's view, Mr. Kleinhans was rude and disrespectful to her in front of a Habitat for

5   Humanity representative.  *Id.*

6           Mr. Kleinhans left the property and the Habitat for Humanity employee asked

7   Ms. Soga, "What did you do to piss him off?"  *Id.*  Ms. Soga replied, "I don't know, he's just mad

8   all the time."  *Id.*  The employee responded, "It's obvious he doesn't like you and I bet it's not

9   just you, it's women in general.  He wasn't happy that you knew where the water shut-off was

10  when he couldn't find it."  *Id.*  When she returned to the Sheriff's Department, Ms. Soga met with

11  Mr. Kleinhans to tell him she was embarrassed by the way he had acted in front of the Habitat for

12  Humanity employee.  *Id.* at 79.  She accused Mr. Kleinhans of having received his job on a silver

13  platter, and asked that he show more respect for the people they served and for his position as

14  Public Administrator.  UMF No. 30.

15          Ms. Soga and Mr. Kleinhans soon developed strong opinions about each other,

16  with Ms. Soga describing him as arrogant, dismissive, and like a "big rooster" puffing his chest,

17  Soga Dep. 36:17–37:9, and Mr. Kleinhans describing her as uncommunicative and difficult,

18  Kleinhans Dep. 56:3–14.  As their relationship worsened, Mr. Kleinhans sought advice from

19  Undersheriff Joseph Salivar, a captain in the Sheriff's Department, and Nancy Haffey, an Analyst

20  in Human Resources (HR).  Defs.' Ex. I, ECF No. 17-5.

21          After receiving others' advice, Mr. Kleinhans set up a meeting with Ms. Soga and

22  Undersheriff Salivar on July 13, 2011.  UMF No. 9.  In this meeting, Mr. Kleinhans and

23  Undersheriff Salivar gave Ms. Soga a letter of instruction, advising her of the County's expected

24  standards of performance and discussing Ms. Soga's key strengths and areas of needed

25  _____

26  motion, the court relies on the facts set forth here as undisputed, assumes Ms. Soga would testify
    regarding them at trial, and draws reasonable inferences from them in her favor.

27

28
                                        4

improvement.  Defs.' Ex. J, ECF No. 17-5.  For key strengths, the letter stated Ms. Soga brought

value to the Sheriff's Department with her "procedural knowledge," "compassionate demeanor

with those in a state of bereavement," and "care about the states of the deceased."  *Id.*  For areas

of needed improvement, the letter stated Ms. Soga had not educated Mr. Kleinhans about the

duties of her position, needed to communicate with him in an "open and honest manner," and

needed to cease her "discourteous treatment" of Mr. Kleinhans.  *Id.*  For her part, Ms. Soga raised

concerns about Mr. Kleinhans's behavior, asserting he was arrogant, condescending, easily

annoyed, gave improper referrals to friends, and failed to adequately manage and handle estates.

Soga Dep. 93:19–21, 152:20–24; Defs.' Ex. I at 51–52.

            After the July 2011 meeting, their relationship did not improve.  Kleinhans Dep.

178:4–22.  Instead, their interactions grew more contentious as time went on.  In August 2011,

Mr. Kleinhans directed Ms. Soga to clean out storage units during the heat of the summer, and in

performing this task she experienced heat exhaustion.  HR Compl. at 81; Soga Dep. 153:19–22.

When she informed Mr. Kleinhans of her condition, his only reaction was, "[s]omeone your age

has to be careful in the sun."  HR Compl. at 81.  In August or September 2011, a house in the

Nevada County town of North San Juan had to be searched and sealed as part of the Public

Administrator's duties.  *Id.* at 81–82.  When Ms. Soga asked Mr. Kleinhans to come with her, he

responded, "You'll have to find someone else to do it."  *Id.*  Around the same time, a family had

asked for directions regarding legal information, and Ms. Soga provided five names of local

attorneys she drew from a list she received from Linda Hartman, the County Counsel.  *Id.* at 82–

83; Soga Dep. 155:15–23.  Mr. Kleinhans reprimanded Ms. Soga, asserting a breach of County

policy, which did not allow County employees to refer people to specific vendors.  HR. Compl. at

82–83.  Shortly thereafter, Ms. Soga worked with the Sheriff's Department's property unit to

process property that recently had been removed from an estate.  Soga Dep. 156:21–157:6.  A

Sheriff's Department employee, Mike Mariani, wrote an email to Ms. Soga, copying Mr.

Kleinhans, stating "atta-girl" for a job well done on the estate.  *Id.*; HR Compl. at 83.  Upon

receiving the e-mail, Mr. Kleinhans stormed out of his office and into Ms. Soga's cubicle,

1  screaming the words, "[y]ou made him write that," to Ms. Soga, while spitting on her.  Soga Dep.

2  157:22–24.

3         After seeing no improvement in his relationship with Ms. Soga, Mr. Kleinhans

4  started visiting HR Analyst Nancy Haffey's office five to six times a day to seek advice in

5  resolving issues with Ms. Soga.  Soga Dep. 177:1–13; Haffey Dep. 88:11–15, 98:25–99:16.

6  During her deposition, Ms. Haffey testified she did not recall when Mr. Kleinhans's frequent

7  visits or calls started to occur, but noted he was angry and frustrated during each visit.  Haffey

8  Dep. 88:11–15, 98:25–99:16.

9         With Ms. Haffey's help, Mr. Kleinhans drafted a second letter of instruction and

10  issued it to Ms. Soga on September 23, 2011, again discussing her behavior.  Haffey Dep.

11  99:20–25.  According to the letter, Ms. Soga needed to improve in "timely, open, and honest

12  communication," and take "personal initiative and responsibility."  Defs.' Ex. K, ECF No. 17-5.

13  Shortly after receiving the letter, in October 2011, Ms. Soga went on medical or stress leave.

14  Defs.' Ex. M.  She returned to work in December 2011.  *Id.*

15         Ms. Soga would continue to encounter Ms. Kleinhans after she returned.  In

16  December 2011, Mr. Kleinhans approached Ms. Soga while she was waiting for the elevator to

17  say, "[y]ou really should be taking the stairs," a remark Ms. Soga interpreted as derogatory.

18  UMF No. 27.  A month later, Ms. Soga witnessed Mr. Kleinhans approach Janet Brenneman, a

19  co-worker who sat in a nearby cubicle.  HR. Compl. at 77.  As Mr. Kleinhans approached he

20  asked, "What are you doing? Getting dressed?" and Brenneman responded, "No, I'm just

21  combing my hair."  Soga Dep. 146:12–17.  Ms. Soga interpreted Kleinhans's tone as

22  inappropriate.  *Id.* at 146:16–17.

23         On January 6, 2012, Ms. Soga requested and received a reassignment to a different

24  unit and a different supervisor, Shelli Netherby, the records supervisor for the Nevada County

25  Sheriff's Department.  UMF No. 17.  In her new position, Ms. Soga completed several

26  administrative tasks including managing the front desk of the administrative unit in the

27  Department, answering phone calls, and completing crime reports.  Soga Dep. 111:9–14.

28  Although they still were in the same general office space, Ms. Soga did not encounter

1    Mr. Kleinhans often, and in any event, "avoided him at all costs." *Id.* at 111:17–112:7.  For

2    example, if Ms. Soga saw Mr. Kleinhans walking down the hallway, she would run in the other

3    direction or hide behind a pillar until he passed by. *Id.* at 112:9–12.

4              But Ms. Soga still encountered Mr. Kleinhans at times.  In March 2012, while

5    standing at a copy machine close to Ms. Brenneman's cubicle, Ms. Soga saw Mr. Kleinhans

6    approach Ms. Brenneman to ask how she was doing.  HR Compl. at 76.  Mr. Kleinhans said

7    something to the effect of, "What . . . you and your hubby, mumble, mumble . . . bouncing,

8    mumble . . . , all night?" *Id.*; Soga Dep. 143:25–144:1–5.  To Ms. Soga, Mr. Kleinhans's tone

9    was inappropriately sexual.  UMF No. 25.  In May or June 2012, a female member of the public

10   came to the Sheriff's Department waiting area to obtain services connected with an ongoing

11   investigation of a burglary.  Defs.' Ex. M, ECF No. 17-5.  As the woman waited for assistance,

12   Ms. Soga saw Mr. Kleinhans inappropriately place his body in a way that crowded the woman

13   and blocked her movement.  UMF Nos. 24, 49.  Mr. Kleinhans would not allow the woman to

14   leave until another person told the woman Ms. Soga wanted to talk with her.  Soga Dep. 140:9–

15   19.

16             In an attempt to get further away from Mr. Kleinhans and still keep her job,

17   Ms. Soga volunteered to transfer to a LOA position in Truckee on January 14, 2013, and started

18   in that position shortly thereafter.  UMF No. 18; Soga Dep. 189:11–16; Defs.' Ex. I.  In her

19   position, Ms. Soga was responsible for picking up and taking mail from the Sheriff's Department

20   in Nevada City to Truckee each morning.  PUMF No. 17.  In this position, Ms. Soga received the

21   added benefit of traveling to and from work on County-sponsored time in a County car filled with

22   fuel paid for by the County.  Soga Dep. 189:25–190:5.  During her deposition, Ms. Soga testified

23   her experience in Truckee was "beautiful," up until the time she resigned on September 3, 2013.

24   Soga Dep. 193:20–194:18.

25             Ms. Soga successfully avoided Mr. Kleinhans from November 2012, while still

26   working in Nevada City, until April 2, 2013, by which time she had started working in Truckee.

27   On April 2, 2013, she had an encounter at the Sheriff's Department that she explained left her

28   "rattled."  HR Compl. at 74–75.  While in the hallway, Mr. Kleinhans said, "Hello"; Ms. Soga

1   nodded without a verbal response.  Soga Dep. 137:1–8.  Ms. Soga then heard five fast, heavy

2   footsteps behind her, with Mr. Kleinhans yelling, "You need to stop being rude to me Kathleen!"

3   Ms. Soga did not look back, picked up her pace, and went quickly down the stairs.  She then

4   heard him say, "Ok . . . okay then!"  HR Compl. at 74–75.

5           Two days after this incident, Mr. Kleinhans complained to Nevada County

6   Sheriff's Department Captain Shannon Moon, Ms. Soga's supervisor, that Ms. Soga had been

7   rude.  *Id.* at 73.  Mr. Kleinhans also complained to Janet Brenneman, who then went to Ms. Soga

8   to say, "[Kleinhans] is really, really mad at you," and he "won't rest until you're gone."  UMF

9   No. 22.

10          C.      Ms. Soga files an Internal Harassment Complaint Against Mr. Kleinhans

11          Ms. Soga's interactions with Mr. Kleinhans led her to file an internal formal

12   complaint of harassment and hostile work environment.  HR Compl.  She filed the complaint with

13   the County HR department on April 16, 2013, asserting the following incidents supported her

14   claims:

15          1.   Incident #1/June 2012: Ms. Soga's warning that Mr. Kleinhans' referral to friends

16               was improper.  HR Compl. at 77.

17          2.   Incident #2/June 2012: Mr. Kleinhans's and Ms. Soga's argument in front of a

18               Habitat for Humanity employee.  *Id.* at 78.

19          3.   Incident #3/June 2012: The Habitat for Humanity employee's comment to

20               Ms. Soga, noting Mr. Kleinhans did not like Ms. Soga because she was a woman.

21               *Id.*

22          4.   Incident #4/July 2011: Mr. Kleinhans's first letter of instruction to Ms. Soga.  *Id.*

23               at 80–81.

24          5.   Incident #5/August 2011: Mr. Kleinhans's directive that Ms. Soga clean out

25               storage units in the heat of summer, causing her to experience heat exhaustion, to

26               which Mr. Kleinhans replied, "[s]omeone your age has to be careful in the sun."

27               *Id.* at 81.

28

8

6. Incident #6/September 2011: Mr. Kleinhans's refusal to help Ms. Soga search and seal a house in North San Juan. *Id.* at 81–82.

7. Incident #7/September 2011: Ms. Soga's infraction arising from recommending attorneys to a family. *Id.* at 82–83.

8. Incident #8/September 2011: The "atta-girl" email sent to Mr. Kleinhans, which resulted in Mr. Kleinhans screaming at Ms. Soga. *Id.* at 83.

9. Incident #9/December 2011: Mr. Kleinhans's comment to Ms. Soga that she should take the stairs. *Id.* at 77.

10. Incident #10/January 2012: Ms. Soga witnessing Mr. Kleinhans approach Ms. Brenneman to ask, "What are you doing? Getting dressed?" *Id.* at 76–77.

11. Incident #11/March 2012: Ms. Soga witnessing Mr. Kleinhans ask Ms. Brenneman if she was "bouncing . . . all night" with her husband. *Id.* at 75–76.

12. Incident #12/May–June 2012: Ms. Soga witnessing Mr. Kleinhans inappropriately crowd a female member of the public who came to the Sheriff's Department for services. *Id.*

13. Incident #13/April 2, 2013: Mr. Kleinhans's saying hello and Ms. Soga not verbally responding. *Id.* at 74–75.

14. Incident #14/April 4, 2013: Mr. Kleinhans's complaint to Captain Shannon Moon that Ms. Soga was rude. *Id.* at 73.

15. Incident #15/April 4, 2013: Ms. Brenneman's warning to Ms. Soga that Mr. Kleinhans was mad at Ms. Soga and would not rest until she was gone. *Id.* at 74; UMF No. 22.

The County immediately began investigating Ms. Soga's internal complaint.  UMF No. 38.  Mr. Kleinhans heard about the complaint on April 22, 2013, and he called three of Ms. Soga's co-workers, including Ms. Brenneman, into his office to ask about the complaint and if he was as "aggressive" as the complaint suggested.  Brenneman Dep. 58:21–62:7.  Later that day, Mr. Kleinhans again reached out to Ms. Brenneman to say, "If I had a gun, I would shoot

1    her," referring to Ms. Soga.  UMF No. 36; HR Brenneman Interview 14, ECF No. 27-4.

2    Ms. Brenneman reported the comment to Nancy Haffey.  HR Brenneman Interview at 15.

3           D.       Kleinhans Disciplined

4           After reviewing her complaint, the County concluded Ms. Soga could not support

5    her harassment and hostile work environment claims.  Report 2, ECF No. 37-1.  However, after

6    hearing from Ms. Brenneman, the County found Mr. Kleinhans's comment that he wanted to

7    shoot Ms. Soga to be inappropriate and a violation of County policy.  *Id.*  The County acted

8    immediately to escort Mr. Kleinhans from the building, and placed him on paid administrative

9    leave for more than four months, from April 22, 2013 until September 3, 2013.  UMF Nos. 39,

10   60; Haffey Dep. 134:23–135:2.  When asked at her deposition whether she thought it was

11   inappropriate for the County to act as it did in disciplining Kleinhans, Ms. Soga answered "no."

12   Soga Dep. 194:19–23

13          E.       Soga Resigns

14          In July 2013, while Mr. Kleinhans was still on leave, Undersheriff Salivar offered

15   to convert Ms. Soga's temporary assignment in Truckee into a permanent position with a ten

16   percent increase in pay, a County car, and gas covered by the County.  UMF No. 63; Soga Decl.

17   ¶ 17, ECF No. 22.  The record does not make clear whether Ms. Soga accepted the offer at this

18   time.  Later that summer on August 28, 2013, Undersheriff Salivar and HR head Charlie Wilson

19   arranged a meeting with Ms. Soga to advise her of Mr. Kleinhans's impending return.  UMF No.

20   40.  They informed Ms. Soga that Mr. Kleinhans wanted to apologize to her, but Ms. Soga

21   refused to meet with Mr. Kleinhans and left work the same day.  UMF Nos. 41–42.

22          Three days after Mr. Kleinhans's return on September 3, Ms. Soga sent a

23   resignation letter to the County.  UMF No. 43.  The County reiterated its offer to give Ms. Soga a

24   permanent position in Truckee with the ten percent pay raise but now without the company car

25   and fuel, and Ms. Soga declined.  Salivar Dep. 98:23–25; Soga Decl. ¶ 17.[4]  Ms. Soga testified at

26   _____

27          [4] Defendants object to portions of this paragraph of Ms. Soga's declaration on grounds of
     lack of personal knowledge/foundation, hearsay, speculation, and relevancy.  All objections are
     overruled to the extent they attack information considered in this order.  The County's personal
28   knowledge, hearsay, and foundation objections are not made in reference to the statement relied

1    her deposition that she declined the offer because it would have been cost prohibitive to drive to

2    and from Truckee, and she felt her safety was in jeopardy.  Soga Dep. 193:1–5.

3    III.    DISCUSSION

4          A.    Hostile Environment Sexual Harassment and Statute of Limitations

5                Defendants argue Ms. Soga's hostile environment sexual harassment claims are

6    barred by the statutes of limitations applicable to Title VII and FEHA actions.  Mot. at 6.

7    Ms. Soga argues defendants' conduct was part of a continuing violation of her rights from the

8    time she started working with Mr. Kleinhans in June 2011, to April 4, 2013, just after her last

9    encounter with Kleinhans in the hallway.  She says the last incident occurred less than one year

10   before she filed her complaint with the DFEH on September 5, 2013, and less than 300 days

11   before she filed a complaint with the EEOC on November 19, 2013, and therefore her claims are

12   not time-barred.  Opp'n at 13.

13                1.    Title VII

14                Title VII is a broad remedial measure, designed "to assure equality of employment

15   opportunities."  *Pullman-Standard v. Swint*, 456 U.S. 273, 276 (1982).  Title VII was designed to

16   bar not only overt employment discrimination, "but also practices that are fair in form, but

17   discriminatory in operation."  *Id.*  A Title VII charge must be filed within 300 days after the

18   allegedly unlawful employment practice.  42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp.*

19   *v. Morgan*, 536 U.S. 101, 119 (2002).

20                Before 2002, a plaintiff could obtain relief for acts outside the limitations period

21   that were part of a "continuing violation" of Title VII rights.  *Sosa v. Hiraoka*, 920 F.2d 1451,

22   1455 (9th Cir. 1990).  A continuing violation could be established by demonstrating a series of

23   "related" acts against a single individual; that is, against the plaintiff alone.  *Id.*  But the United

24   States Supreme Court limited this doctrine in *Morgan*, holding "discrete discriminatory acts are

25   not actionable if time barred, even [if] related to acts alleged in timely filed charges."  536 U.S. at

26   _____

27   upon in this order.  Defendants' relevancy and speculation objections are overruled because such
     objections are redundant; the court does not rely on irrelevant or speculative facts.  *Burch v.*
     *Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

28

1  113. A "discrete act," even if related to another "discrete act," would start a new clock for filing

2  charges. *Id.*

3        The *Morgan* Court carved out an exception for claims based on a hostile work

4  environment. *See id.* at 115. Noting by their very nature that hostile environment claims

5  involved "repeated conduct," the Court held such claims are not "time barred so long as all acts

6  which constitute the claim are part of the same unlawful employment practice and at least one act

7  falls within the time period." *Id.* Applying this rule to the facts of its case, the *Morgan* Court

8  allowed the plaintiff's racial discrimination claim to proceed on the hostile environment theory,

9  holding a reasonable juror could conclude the plaintiff's evidence, that managers "made racial

10  jokes, performed racially derogatory acts, and used various racial epithets," could be a part of the

11  same actionable hostile environment claim. *Id.* at 120–21. In sum, *Morgan* held claims based on

12  discrete acts are timely only when such acts occurred within the limitations period, and claims

13  based on a hostile environment are timely only when at least one act occurred during the

14  limitations period. *See id.*; *see also Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003).

15        The Ninth Circuit Court of Appeals further limited the reach of the hostile

16  environment exception, holding intervening occurrences can separate prior incidents from more

17  recent incidents such that the plaintiff may not recover for prior incidents. *McGinest v. GTE Serv.*

18  *Corp.*, 360 F.3d 1103, 1126 (9th Cir. 2004). In *McGinest*, the Ninth Circuit held the plaintiff

19  could not prevail on his Title VII racial discrimination claim because the prior acts and more

20  recent acts were separated by several years, in addition to other attenuating circumstances

21  including the plaintiff's change in job title, transfer to another department, change in supervisor,

22  and transfer to another location. *Id.* at 1129.

23        Here, but for the "hostile environment exception," only incidents occurring on or

24  before January 23, 2013, 300 days before she filed her EEOC complaint, can support Ms. Soga's

25  Title VII sexual harassment hostile environment claim. In contrast to *Morgan*, the incidents

26  giving rise to Ms. Soga's Title VII sexual harassment claim are "discrete" and not sufficient to

27  form a "hostile environment." The discrete acts, as identified by Ms. Soga, include: Ms. Soga's

28  warning to Mr. Kleinhans about his referrals to friends and his response, HR Compl. at 77; Ms.

1    Soga's receipt of the June 2011 letter of instruction, *id.* at 80–81; Mr. Kleinhans's demand that

2    Ms. Soga work in the hot summer sun, and his comment signaling the punitive nature of the

3    assignment, *id.* at 81;  Mr. Kleinhans's reprimand of Ms. Soga for encouraging the "atta-girl"

4    email, *id.;* his verbal altercation with her in front of the Habitat for Humanity employee, *id.* at 78;

5    and Mr. Kleinhans's reprimand of Ms. Soga for recommending attorneys to a member of the

6    public, *id.* at 82–83.  These instances do not "repeat" each other as did the racial jokes, racial

7    epithets, and racially derogatory acts giving rise to the plaintiff's racial discrimination claim in

8    *Morgan.  See* 536 U.S. at 120–21 ("racial jokes, . . . racially derogatory acts, . . . negative

9    comments regarding the capacity of blacks to be supervisors, and . . . various racial epithets" can

10   support hostile environment claim).  These incidents are less "related" to each other than to

11   incidents other courts have deemed discrete, further suggesting Ms. Soga's claim cannot prevail

12   on the hostile environment theory.  *See, e.g., Macgregor v. Dial*, No. 13–1883, 2015 WL

13   1405492, at *9 (E.D. Cal. Mar. 26, 2015) (denials of medical treatment in response to plaintiff's

14   repeat requests made on several different dates constituted "discrete acts of deliberate

15   indifference."); *Pouncil v. Tilton*, 704 F.3d 568, 581 (9th Cir. 2012) (repeated denials of

16   prisoner's request for a conjugal visit are discrete acts); *RK Ventures, Inc. v. City of Seattle*,

17   307 F.3d 1045, 1061 n.13 (9th Cir. 2002) (municipality's alleged pattern of hostile or harassing

18   conduct constitute "discrete acts" because each incident was actionable on its own).

19           Furthermore, intervening occurrences preclude the hostile environment exception

20   from applying here.  Between the untimely twelfth incident, in which Ms. Soga witnessed Mr.

21   Kleinhans inappropriately crowd a female member of the public who came to the Sheriff's

22   Department for services, HR Compl. at 75–76, and the timely thirteenth incident in which Ms.

23   Soga did not respond to Mr. Kleinhans's attempt to say "hello," provoking his frustrated

24   response, *id.* at 74–75, over ten months passed.  During this time, Ms. Soga was transferred to an

25   entirely new location, UMF No. 18, and Ms. Soga and Mr. Kleinhans had not seen each other for

26   at least six months, HR Compl. at 74–75.  Construing these facts in a light most favorable to the

27   plaintiff, no reasonable juror could conclude the timely and untimely incidents supporting Ms.

28

13

1  Soga's Title VII claim involve clear repetitions of the same behavior, such that her hostile

2  environment claim overcomes summary judgment.

3           Finally, to the extent any incidents are plausibly repetitions and sexually hostile in

4  nature, they are not linked to other incidents identified in the HR Complaint.  These matters

5  include the tenth incident, in which Ms. Soga witnessed Mr. Kleinhans approach Ms. Brenneman

6  to ask, "What are you doing? Getting dressed?," HR Compl. at 76–77; the eleventh incident in

7  which Ms. Soga witnessed Mr. Kleinhans ask Ms. Brenneman if she was "bouncing . . . all night"

8  with her husband, *id.* at 75–76; and the twelfth incident in which Ms. Soga witnessed Mr.

9  Kleinhans inappropriately crowd a female member of the public who came to the Sheriff's

10  Department for services, *id*.  Moreover, they fall outside the statute of limitations:  Incidents one

11  through twelve occurred prior to January 23, 2013 and are therefore claims based on them are

12  time-barred.

13           The court next considers Ms. Soga's FEHA claims.

14           2.     The FEHA

15           "The purpose of the FEHA is to provide effective remedies which will eliminate

16  discriminatory practices . . . ." *Blum v. Super. Court*, 141 Cal. App. 4th 418, 424, (2006).  For

17  acts arising under the FEHA, a plaintiff must file a complaint with the DFEH within one year

18  from the date upon which the alleged unlawful practice occurred.  Cal. Gov't Code § 12960(d);

19  *Reyes v. Healthcare Servs. Groups, Inc.*, No. 15–07177, 2015 WL 6551870, at *3 (C.D. Cal.

20  Oct. 26, 2015).  An employer is liable for actions that take place outside the limitations period if

21  these actions are "sufficiently linked" to unlawful conduct that occurred within the limitations

22  period. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1056 (2005).   The employers' actions

23  are sufficiently linked if they (1) were sufficiently similar in kind, while recognizing that similar

24  kinds of unlawful employer conduct, such as acts of harassment, may take a number of different

25  forms; (2) occurred with reasonable frequency; and (3) have not acquired a degree of

26  permanence, in that the "employer's statements and actions make clear to a reasonable employee

27  that any further efforts at informal conciliation to . . . end harassment will be futile." *Id.* at 1059

28  & n.19.

1    But for the "sufficiently linked" exception, only incidents occurring on or before

2  September 5, 2012, one year before Ms. Soga filed her DFEH complaint, can support Ms. Soga's

3  FEHA sexual harassment hostile environment claim.

4    Similar to the court's analysis in the Title VII context, the break in time between

5  the untimely twelfth incident and the timely thirteenth incident, in addition to Ms. Soga's transfer

6  to Truckee, precludes a reasonable jury's concluding the incidents occurred "with reasonable

7  frequency" such that all incidents are "sufficiently linked." *Yanowitz*, 36 Cal. 4th at 1056; *see*

8  *also Leland v. City & Cty. of S.F.*, 576 F. Supp. 2d 1079, 1096 (N.D. Cal. 2008) (continuing

9  violation doctrine could not apply when untimely conduct was insufficiently close enough in time

10  or similar).  Further, as in the Title VII analysis, the three plausibly sexual harassing incidents are

11  outside the limitations period.

12    In sum, the continuing violations doctrine does not apply to the acts giving rise to

13  Ms. Soga's FEHA or Title VII claims.  To the extent Ms. Soga's Title VII and FEHA sexual

14  harassment hostile environment claims are based on acts outside the applicable statute of

15  limitations, such claims are dismissed as time-barred.  The only acts that can give rise to

16  Ms. Soga's sexual harassment claim are incidents thirteen through fifteen, considered below.

17    3.    Merits Analysis

18    To establish a FEHA or Title VII "hostile work environment" claim, plaintiff must

19  demonstrate conduct "sufficiently severe or pervasive to alter the conditions of the victim's

20  employment and create an abusive working environment." *Swenson v. Potter*, 271 F.3d 1184,

21  1191 (9th Cir. 2001) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see*

22  *also Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (Title VII and FEHA operate

23  under the same guiding principles).  "The working environment must both subjectively and

24  objectively be perceived as abusive." *Brooks*, 229 F.3d at 923.  The court uses a totality of the

25  circumstances test to determine whether a plaintiff's allegations make out a colorable claim of

26  hostile work environment. *Id.* at 923–24.  Under this test, the frequency, severity, and level of

27  interference with work performance are among the factors considered. *Id.* at 924.

28

15

1    Moreover, although untimely acts cannot give rise to a Title VII or FEHA claim,

2  the statute of limitations does not "bar an employee from using the prior acts as background

3  evidence in support of a timely claim." *Morgan*, 536 U.S. at 113; *Raad v. Fairbanks N. Star*

4  *Borough Sch. Dist.*, 323 F.3d 1185, 1192 (9th Cir. 2003) (although not independently actionable,

5  "evidence about the District's refusal to hire Raad for a full-time teaching position in 1991 and

6  1992 is relevant and admissible insofar as it bears on her claim that she was discriminatorily

7  refused a full-time position in August 1993"); *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir.

8  2002) ("[A]ppellants are permitted to offer evidence of the pre-limitations discriminatory detail

9  assignment scheme in the prosecution of their timely claims.").

10    The district court case of *Ortega v. Regents of Univ. of Cal.*, No. 11–04031, 2012

11  WL 5988638, at *1 (N.D. Cal. Nov. 29, 2012), is illustrative here.  In *Ortega*, a Hispanic woman

12  and Asian woman both filed FEHA and Title VII claims against their employer, alleging racial

13  and gender-based discriminatory treatment in the interview and promotion process for a director

14  position in the workplace.  *Id.* at *1–2.  In analyzing plaintiffs' claims, the court held prior acts of

15  discriminatory conduct, namely promotions that took place before the statute of limitations

16  period, could be used to assess whether the interview and promotion process at issue in plaintiffs'

17  case violated Title VII and FEHA.  *Id.* at *5.  Although the prior acts were not actionable in and

18  of themselves, such acts could provide background evidence to support plaintiffs' claims.  *Id.* at

19  *4.

20    Here, incidents thirteen through fifteen occurred within a two-day period, from

21  April 2, 2013 to April 4, 2013.  HR Compl. at 74–75, UMF No. 22.  Construing the "totality of

22  the circumstances" in a light most favorable to the plaintiff, no reasonable jury could conclude a

23  complaint about Ms. Soga's rudeness, in addition to hearing Mr. Kleinhans would not rest until

24  Ms. Soga was gone, by themselves created an "abusive" working environment.  *See Meritor*,

25  477 U.S. at 67.  When considering incidents one through twelve as background, a reasonable jury

26  could conclude acts thirteen through fifteen may have heightened the hostility of Ms. Soga's

27  workplace, but not so much that the workplace was rendered abusive with "pervasive" or

28  "frequent" acts abounding.  *See Brooks*, 229 F.3d at 926 ("the required showing of severity or

16

1  seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the

2  conduct. . .[i]f a single incident can ever suffice to support a hostile work environment claim, the

3  incident must be extremely severe.").

4          Defendants' motion for summary judgment is GRANTED.

5        B.      Retaliation under Title VII and the FEHA

6          The County and Mr. Kleinhans also move for summary judgment on Ms. Soga's

7  retaliation claim, contending they took no adverse action after she filed her HR complaint.  Mot.

8  at 15.  Ms. Soga argues the County and Mr. Kleinhans engaged in a "series of retaliatory actions,"

9  including constructive discharge, which together support her claim for retaliation.

10 Opp'n at 12–15.

11         1.      Legal Standards

12         To defeat summary judgment on a retaliation claim under Title VII or the FEHA,

13 the plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action,

14 and (3) a causal link between the two.  *Brooks*, 229 F.3d at 928.  Thereafter, the burden of

15 production shifts to the employer to present legitimate reasons for the adverse employment

16 action, and if the employer carries this burden, a plaintiff must demonstrate a genuine issue of

17 material fact as to whether the reason advanced by the employer is pretext.  *Id.*; *see also Flait v.*

18 *N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992) (FEHA).

19         To constitute "protected activity," the conduct a plaintiff opposes must constitute a

20 violation of Title VII or the FEHA.  *See* 42 U.S.C. § 2000e–3; *Learned v. City of Bellevue*,

21 860 F.2d 928, 932 (9th Cir. 1988) ("[T]he opposed conduct must fairly fall within the protection

22 of Title VII to sustain a claim of unlawful retaliation."); *see also Flait*, 3 Cal. App. 4th at 476.

23 The opposition can be formal or informal, so long as the plaintiff reasonably believed the

24 employer engaged in an unlawful employment practice under Title VII or the FEHA.  *See Ray v.*

25 *Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (an informal complaint to a supervisor is a

26 protected activity).

27         An adverse employment action is one that "materially affect[s] the compensation,

28 terms, conditions, or privileges of the [plaintiff's] employment."  *Chuang v. Univ. of Cal. Davis,*

1  *Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000).   For purposes of a Title VII or FEHA retaliation

2  claim, a plaintiff must show that "a reasonable employee would have found the challenged action

3  materially adverse," meaning "it might well have 'dissuaded a reasonable worker from making or

4  supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

5  60 (2006).

6           A plaintiff can also establish adverse employment action by showing she was

7  constructively discharged.  *See Pa. State Police v. Suders*, 542 U.S. 129, 130 (2004) ("Under the

8  constructive discharge doctrine, an employee's reasonable decision to resign because of

9  unendurable working conditions is assimilated to a formal discharge for remedial purposes."); *see*

10  *also Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1996) (constructive discharge

11  is an adverse employment action); *Jordan v. Clark*, 847 F.2d 1368, 1377 n.10 (9th Cir. 1988)

12  (same).  Constructive discharge occurs when working conditions deteriorate as a result of

13  discrimination, to the point they become "sufficiently extraordinary and egregious to overcome

14  the normal motivation of a competent, diligent, and reasonable employee to remain on the job to

15  earn a livelihood and to serve his or her employer."  *Brooks*, 229 F.3d at 930; *see also Poland v.*

16  *Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007).  Although the determination of whether conditions

17  were sufficiently intolerable and discriminatory is normally a factual question left to the trier of

18  fact, a plaintiff must at least show some "'aggravating factors,' such as a 'continuous pattern of

19  discriminatory treatment'" to survive summary judgment.  *Thomas v. Douglas*, 877 F.2d 1428,

20  1434 (9th Cir. 1989).

21           In evaluating a constructive discharge claim, the Ninth Circuit has considered the

22  time that elapses between the rise of intolerable working conditions and an employee's

23  resignation to determine whether a reasonable employee would have felt compelled to resign.

24  *Poland*, 494 F.3d at 1185.  For example, in *Poland*, the district court concluded the plaintiff

25  employee's transfer from a supervisory position in Oregon to a nonsupervisory position in

26  Virginia amounted to a "constructive discharge" because the transfer would have resulted in

27  separation from his family and demotion.  *Id.* at 1184.  The Ninth Circuit held otherwise,

28  concluding that because the plaintiff had worked five months in the nonsupervisory position after

18

1    the transfer and before retiring, and three additional months after retiring during which he still

2    was paid, he was not constructively discharged. *Id.* at 1185. In the Ninth Circuit's view, working

3    additional months was not "the action[] of someone who finds his working conditions so

4    intolerable that he felt compelled to resign." *Id.*

5             To show a causal link, a plaintiff must present evidence sufficient to raise the

6    inference that her protected activity was the likely reason for the adverse action. *Cohen v. Fred*

7    *Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). That an employer's actions were caused by an

8    employee's engagement in protected activities may be inferred from "proximity in time between

9    the protected action and the allegedly retaliatory employment decision." *Ray*, 217 F.3d at 1244.

10             2.    <u>Analysis</u>

11                 a)    <u>Protected Activity</u>

12             Ms. Soga contends she engaged in "protected activity" by both (1) opposing

13    "gender harassment" during a meeting with Mr. Kleinhans on July 13, 2011, when she received

14    her first letter of instruction; and (2) filing a formal HR complaint on April 16, 2013.

15    Opp'n at 14.

16             Ms. Soga's HR Complaint is protected activity because the complaint alleges

17    several inappropriate acts, some of which were sexually harassing in nature and which Ms. Soga

18    reasonably believed violated Title VII or the FEHA. *Chuang*, 225 F.3d at 1126. As for the

19    July 13, 2011 meeting during which Ms. Soga objected to Mr. Kleinhans's arrogant attitude and

20    attempted to make job referrals to his friends, conduct that she characterizes as "gender

21    harassment," no reasonable juror could conclude such conduct violated Title VII or FEHA. On

22    the record before the court, Ms. Soga's HR complaint constitutes protected activity, and only acts

23    that took place after she filed her complaint on April 16, 2013 alleging harassment and hostile

24    work environment can support her retaliation claim. *See Jordan*, 847 F.2d at 1376 ("[Plaintiff]

25    must show 'that she engaged in a protected activity, that she was thereafter subjected by her

26    employer to adverse employment action." (citing *Cohen*, 686 F.2d at 796)).

27

28

1

      b)  Adverse Employment Action

2

    Ms. Soga characterizes two incidents as adverse employment actions by the

3

County: (1) an August 23, 2013 meeting in which the County informed Ms. Soga that

4

Mr. Kleinhans was returning to work after he made the verbal threat of violence against her; and

5

(2) the County's call to Ms. Soga after her resignation, in which the County reiterated its offer to

6

give Ms. Soga a permanent position in Truckee, but without free gas and a company car, as first

7

proposed.  UMF No. 66.  Ms. Soga argues Mr. Kleinhans individually engaged in two adverse

8

employment acts in:  (1) interrogating three female co-workers in late April 2013 to determine if

9

Ms. Soga had filed the HR complaint; and (2) making a serious threat of violence against

10

Ms.  Soga after she filed the HR complaint.  Opp'n at 8–13.  Ms. Soga argues all these acts taken

11

together form the basis of her constructive termination claim.  *Id.* at 16.  While she also argues

12

several other events before April 16, 2013 also support her retaliation claim, those acts occurred

13

before she filed her HR complaint.

14

      (1)  General Adverse Employment

15

       a. County

16

    The County's call made after Ms. Soga's resignation is easily disposed of, as it

17

was not an adverse employment action.  Because Ms. Soga was no longer an employee with the

18

County, the offer, although less favorable than the prior offer, could not have affected the

19

"compensation, terms, conditions, or privileges of [Ms. Soga's] employment."  *Chuang*, 225 F.3d

20

at 1126.

21

    The County's decision to let Mr. Kleinhans return is similarly disposed of

22

Ms. Soga has not established a causal link between her HR complaint and this decision.  The

23

County's decision came after it first ordered Mr. Kleinhans take paid administrative leave and

24

after the County conducted a thorough investigation over more than four months.  When asked at

25

her deposition whether she thought it was inappropriate for the County to act as it did in allowing

26

Kleinhans to return to work, Ms. Soga answered "no."  Soga Dep. 194:19–23.  Further, no

27

evidence before the court raises a material dispute as to whether the County would have

28

responded differently in its handling of Kleinhans's employment if Ms. Soga had not filed her HR complaint.

Defendants' motion for summary judgment is GRANTED on these aspects of Ms. Soga's retaliation claim.

### b. Kleinhans

On the other hand, a reasonable jury could conclude Mr. Kleinhans's interrogation of three female co-workers after Ms. Soga filed her HR complaint, and his threat communicated to Ms. Brenneman, constituted adverse employment action.  The undisputed material facts show Ms. Soga and Mr. Kleinhans had a hostile and contentious relationship.  For example, Mr. Kleinhans screamed and spit on Ms. Soga after he saw the "atta-girl" email from another employee.  While the interrogation and threat by themselves may not have changed the terms of Ms. Soga's employment immediately or directly because they occurred behind Ms. Soga's back, given the County's response, a reasonable jury could conclude Mr. Kleinhans's conduct ultimately did have the effect of altering the "conditions" of Ms. Soga's employment.  An employee who anticipates that a superior to her in the hierarchy of a department will interrogate co-workers about her actions and tell a co-worker he wants to harm her, may reasonably be dissuaded from filing a complaint.

### (2)    Constructive Discharge

Support for Ms. Soga's constructive discharge claim also takes the form of (1) the post-resignation County call; (2) Mr. Kleinhans's interrogation of co-workers; and (3) Mr. Kleinhans's threat of violence communicated to a co-worker.

No reasonable juror could conclude the County's call effected a constructive termination, for Ms. Soga had already resigned, the call was not "sufficiently extraordinary or egregious," and the call could not have amounted to "discriminatory treatment." On the other hand, a reasonable jury could find that Mr. Kleinhans's threat, when considered together with the County's decision to let Mr. Kleinhans return to work, made Ms. Soga's working conditions intolerable.  Although there was a five-month gap between Mr. Kleinhans's threat and interrogation of co-workers, and Ms. Soga's resignation, Ms. Kleinhans was on administrative

leave during virtually that entire time.  This makes Ms. Soga's case distinguishable from *Poland* because her delay in resigning did not occur during purportedly deteriorating conditions.  During the time Mr. Kleinhans was absent and the County was investigating his threat, Ms. Soga had little reason to assume working conditions were deteriorating as to "overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job."  *Brooks*, 229 F.3d at 930; *Poland*, 494 F.3d at 1184.

But Ms. Soga then resigned less than two weeks after hearing Mr. Kleinhans was returning, and three days after he did return.  Additionally, Ms. Soga declined to take the County's job offer to reside in Truckee permanently, even with a ten percent raise, because she felt her safety was in jeopardy.  Soga Dep. 193:1–5.  A reasonable jury could conclude she felt this way because of Mr. Kleinhans's verbal threat.  Taken together, Mr. Kleinhans's threat to shoot Ms. Soga, and his intimidation of Ms. Soga's co-workers, could reasonably be found to qualify as "aggravating factors" "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job."  *Brooks*, 229 F.3d at 930; *Poland*, 494 F.3d at 1184.  Mr. Kleinhans's actions as a County employee could support a finding of constructive discharge.

(3)      Causal Link

A reasonable jury also could conclude Mr. Kleinhans's actions were causally linked to Ms. Soga's filing her HR complaint.  In her deposition, HR Analyst Nancy Haffey described how Mr. Kleinhans almost immediately called Ms. Soga's three co-workers into his office after HR informed him about the complaint.  Haffey Dep. 131:4–9.  Ms. Brenneman's testimony was consistent.  Brenneman Dep. 58:21–62:7.  On the same day, he threatened to shoot Ms. Soga if he had a gun.  HR Brenneman Interview at 14.

(4)      Legitimate Reasons

Having determined certain acts could be found by a jury to constitute adverse employment actions, the court next considers whether the defendants "present legitimate reasons for the adverse employment action[s]."  *Brooks*, 229 F.3d at 928.  Defendants in fact offer no explanation for Mr. Kleinhans's interrogation of the three employees.  As to Mr. Kleinhans's

22

1  threat of violence, the County argues it handled the situation seriously by ordering Mr. Kleinhans

2  to leave the premises, putting him on administrative leave, and investigating the situation

3  thoroughly.  Mot. at 17–18.  The County's prompt response, however, does not show how or why

4  Mr. Kleinhans's threat was in any way justified.  Nor could it, given the outrageousness of the

5  threat.

6                 Summary judgment is DENIED.

7                 In sum, the court finds Mr. Kleinhans's behavior in the form of the co-worker

8  interrogation and verbal threat could support Ms. Soga's retaliation claim.  Defendants' motion

9  for summary judgment is DENIED on these aspects of Ms. Soga's Title VII and FEHA retaliation

10  claims.

11        C.     Retaliation Under Labor Code Section 1102.5

12                 The County contends Ms. Soga's state law retaliation claim is procedurally barred

13  under Labor Code section 1102.5 because Ms. Soga did not exhaust her administrative remedies

14  by filing a California Government Tort Claim prior to filing suit.  Mot. at 6.  Ms. Soga contends

15  she was not required to file a Government Tort Claim.  Opp'n at 25.

16                 No suit for damages may be brought against a public entity until a written claim

17  has been presented to and rejected by that entity.  *Munoz v. California*, 33 Cal. App. 4th 1776,

18  1777 (1995).  Compliance with this requirement constitutes an element of a state claim for

19  damages against a public entity, and failure to meet this requirement is fatal to the claim.  *See*

20  *State v. Super. Court* (*Bodde*), 32 Cal. 4th 1234, 1239 (2004); *Karim-Panahi v. L.A. Police Dep't*,

21  839 F.2d 621, 627 (9th Cir. 1988).

22                 Here, it is undisputed that Ms. Soga did not present her Labor Code retaliation

23  claim in the form of a California Government Tort Claim before filing suit against the County or

24  Mr. Kleinhans.  UMF No. 46.  Defendants' motion for summary judgment is GRANTED as to

25  this state claim.

26  /////

27  /////

28  /////

23

IV.     <u>CONCLUSION</u>

        Defendants' motion is GRANTED as to Ms. Soga's sexual harassment claims under Title VII and FEHA; DENIED as to Ms. Soga's Title VII and the FEHA retaliation claims based on Mr. Kleinhans's threat and interrogation of co-workers; and GRANTED as to Ms. Soga's Labor Code section 1102.5 retaliation claim.

        This resolves ECF No. 17.

        IT IS SO ORDERED.

DATED:  August 8, 2016.



_____
UNITED STATES DISTRICT JUDGE